NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0138n.06

No. 11-1817

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**Feb 06, 2013**
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| Plaintiff-Appellee, | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| v. | ) | MICHIGAN |
| | ) | |
| HERMAN NORMAN JOHNSON, | ) | |
| aka HERMAN DAVIS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:  CLAY and WHITE, Circuit Judges; HOOD, District Judge.[*]

**HELENE N. WHITE, Circuit Judge.**  This is a direct appeal in a murder-for-hire case.

Herman Johnson challenges the district court's denial of his renewed motion to suppress and for a

*Franks* hearing.  We **AFFIRM**.

I.

Waad Murad owned and operated the Metro Car Company, a pre-owned vehicle business

located on Woodward Avenue near Seven Mile Road in Detroit.  In 2004, after several vehicles

registered to or purchased from Metro Car were stopped in various parts of the country and found

to be carrying large quantities of cocaine or currency, Drug Enforcement Administration (DEA)

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

1

Special Agent Edward Donovan initiated a narcotics and money-laundering investigation into Murad. A November 2004 raid of Metro Car pursuant to a federal warrant uncovered records of persons in the Detroit drug community who had purchased luxury cars under false names from Metro Car. Several months after that raid, Murad agreed to cooperate with authorities in their investigation of a number of high-level drug targets in the Detroit area.

At approximately 5:45 p.m. on March 17, 2005, two men approached Murad while he sat in the driver's seat, and another person sat in the passenger seat, of a vehicle in Metro Car's parking lot. One of the men produced a revolver and fired a single shot into Murad's head. Murad died the next day from the gunshot wound.

Murad's family publicly offered a $50,000 reward for information leading to the apprehension of those responsible and, approximately one week after the shooting, an unknown woman called Metro Car and said she had information about the shooting and knew where the shooter lived. The police observed the woman meet with Metro Car employees. She requested half the reward money, left, and when she returned later that day, police transported her to the Michigan State Police (MSP) post and interviewed her. The woman told Agent Donovan that her boyfriend and one of his associates (later referred to in the search-warrant affidavit as DPD-1 and DPD-2) found out that the person responsible for Murad's shooting lived at 14270 Strathmoor in Detroit.

During several phone conversations, DPD-1 told Agent Donovan that he was an associate of one of the persons involved in Murad's murder, whom DPD-1 described as a black male whose

street name was "Little Herm" or "Little Hearn,"[1] and who lived at 14270 Strathmoor, and used cell-

phone number (313) 478-4974. DPD-1 said he knew Little Herm only by his street name, and that

the day after Murad was shot, Little Herm bragged to him about getting paid for "taking care of some

work on Woodward."

DPD-2 also called Metro Car and was referred to Agent Donovan. Donovan testified that

DPD-2 called him approximately 8 days after Murad's shooting and told him that he/she was a friend

of Little Herm, that Little Herm lived at 14270 Strathmoor by himself, and that Little Herm had

bragged that he was paid in stacks for shooting Murad. DPD-2 gave Agent Donovan Little Herm's

cell-phone number, which was the same number DPD-1 had provided. DPD-2 told Donovan that

Little Herm approached him/her to try to trade the gun used in the Murad homicide and that she/he

had seen the gun, a chrome .357 revolver, in the back bedroom of 14270 Strathmoor two or three

days before the conversation with Agent Donovan. DPD-2 told Donovan that the police should

move quickly, because the gun would soon be sold or destroyed. DPD-2 described Little Herm as

a dark-skinned 30-to-35-year-old bald black male with a disfigured lip, 5'4" to 5'5" tall, and weighing

between 130 and 155 lbs. Both DPD-1 and -2 told Donovan that they had been to Little Herm's

house on Strathmoor many times.

---

[1]Donovan testified that due to pronunciation or clarity problems, he could not tell whether the informants were saying"Little Herm" or "Little Hearn" when he spoke to them on the phone. Donovan testified that it was several weeks after the search of 14270 Strathmoor, when he first met with one of the informants and showed him a photograph of Defendant, that Donovan understood the informant to be saying "Little Herm." R. 228 at 108-10; PID 1514-16.

Agent Donovan obtained records for the cell phone the informants attributed to Little Herm. The records showed that the phone was registered to a Frederick Harrison and that at the time of Murad's shooting, the closest T-Mobile cell tower to that cell phone was 1 to 1 1/2 miles from Metro Car. The records indicated that after the time of the shooting on the afternoon of March 17, 2005, the cell phone registered on a cell tower in the area of 14270 Strathmoor and remained there for several hours. The records also revealed that, in the two weeks after Murad's shooting, the cell phone was not in the area around Metro Car, and that DPD-1 and DPD-2 had telephone contact with that cell phone both before and after Murad was shot.

A joint task force of the Detroit Police Department (DPD), Michigan State Police (MSP), and DEA obtained a search warrant for 14270 Strathmoor and executed the warrant on March 29, 2005. When police entered 14270 Strathmoor, they found Defendant holding the cell phone (313) 478-4974. After photographing Defendant, Agent Donovan showed the photograph to DPD-2, who confirmed that Defendant was the person he knew as Little Herm. The police arrested Defendant after determining his true identity and that he had an outstanding arrest warrant under an alias.

A one-count indictment issued charging Johnson with being a felon-in-possession of a firearm. In August 2005, Johnson's first counsel moved to suppress the evidence seized at 14270 Strathmoor. The district court denied the motion following a two-day suppression hearing.

A three-count superseding indictment issued on November 1, 2005, charging Johnson with 1) conspiring to kill Murad with the intent to prevent Murad from communicating to a law enforcement officer regarding the commission of federal offenses, including distribution of cocaine, conspiracy to distribute cocaine and money laundering to conceal drug trafficking; 2) aiding and

4

abetting murder to prevent Murad from providing information regarding a federal crime to a law enforcement officer; and 3) being a felon in possession of a firearm.

Johnson's second counsel filed a renewed motion to suppress and for a *Franks* hearing in August 2009, arguing that the search-warrant affidavit failed to establish either the informants' reliability or independent police corroboration of the information they provided, and that Johnson had made a substantial preliminary showing that the affidavit contained deliberately or recklessly false statements without which no warrant would have issued. The district court denied the motions following a hearing on October 7, 2009, and the matter proceeded to trial. A jury found Johnson guilty of the three counts charged in the superseding indictment. The district court imposed concurrent life sentences for the conspiracy and murder convictions and a concurrent 10-year sentence for the felon-in-possession conviction.

## II.

We review the denial of Johnson's renewed motion to suppress under a dual standard; the district court's factual findings for clear error, and its legal conclusions, including whether the warrant affidavit established probable cause to support the issuance of a warrant, *de novo*. *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001).

## A.

DPD Sergeant Arlie Lovier's affidavit, signed on March 29, 2005, stated in its totality:

The following facts are sworn to by affiant in support of the issuance of this warrant:

The affiant is currently a member of the [DPD] and has been so for the past thirty-one (31) years, with the endmost fifteen plus years . . . assigned to the Homicide Section.

5

Affiant has personally been involved in and investigated numerous homicide investigations.

Affiant has [*sic*] charged with the investigation regarding the fatal shooting of Waed [*sic*] Murad, which occurred on March 17, 2005, at approximately 5:40PM, at his place of business, Metro Car Company, located at 19590 Woodward, Detroit, Michigan.

The investigation revealed COMPL MURAD, while sitting in his vehicle, a red Dodge Durango SUV, was approached by two (2) black males. One of these subjects fired one (1) round from a handgun, striking COMPL MURAD behind his left ear. The assailants then fled, running south on Woodward . . . MURAD . . . expired on March 18, 2005 as a result of his injury. Morgue File [].

While investigating the fatal shooting . . . agents of the DEA/DPD/MSP Homicide Task Force obtained information from a confidential source, hereafter referred to as DPD-1. DPD-1 has provided information regarding this investigation which has been independently corroborated with independent evidence obtained by agents and officers involved in this investigation. DPD-1, who has identified himself/herself as a close associate to ZACHARY HEARN, [2] stated ZACHARY HEARN JR. is one of the individuals responsible for the fatal shooting of COMPL MURAD. DPD-1 further stated HEARN currently resides at 14270 Strathmoor, Detroit . . . and that DPD-1 has frequented HEARN's residence several times during the past thirty (30) days. Additionally, DPD-1 stated HEARN is currently in possession of the firearm used to kill COMPL MURAD. DPD-1 stated he/she and HEARN have had conversations regarding HEARN'S involvement in the homicide during which time HEARN indicated the firearm in HEARN'S possession was utilized to kill COMPL MURAD. HEARN also told DPD-1 he (HEARN) needed to trade or sell the firearm immediately.

Furthermore, DPD-1 provided agents with cellular telephone number (313) 478-4974, which is subscribed to FREDERICK HARRISON at 13574 Abington, Detroit . . . as a cellular telephone utilized by HEARN.

As part of this same investigation, agents obtained information from a second confidential informant, hereafter referred to as DPD-2, who also identified

---

[2]In fact, DPD-1 and -2 identified themselves as close associates of "Little Herm" or Little Hearn," not of Zachary Hearn or Zachary Hearn, Jr. Defendant is not Zachary Hearn or Zachary Hearn, Jr. This issue was addressed at the first suppression hearing, discussed *infra*.

himself/herself as an associate of ZACHARY HEARN. DPD-2 has also provided information regarding this investigation which had [*sic*] been independently corroborated by independent evidence obtained by agents and officers involved in this investigation. DPD-2 advised agents ZACHARY HEARN was responsible for the fatal shooting of COMPL MURAD. DPD-2 stated he/she also had a conversations [*sic*] with HEARN regarding HEARN'S involvement in the shooting of COMPL MURAD. Additionally, DPD-2 stated HEARN was in possession of a chrome revolver and that HEARN told DPD-2 the firearm was utilized in the murder of COMPL MURAD and that HEARN was trying to sell or trade the firearm.

DPD-2 stated he/she observed the firearm as [*sic*] three to five days earlier.

Additionally, DPD-2 provided officers with cellular telephone number (313) 478-4974, which is subscribed to FREDERICK HARRISON at 13574 Abington, Detroit . . . as the cellular telephone currently utilized by ZACHARY HEARN JR.

As part of this investigation, investigator's [*sic*] analyzed cellular telephone records fro [*sic*] cellular telephone (313) 478-4974, the cellular telephone currently utilized by ZACHARY HEARN. Based on telephone records and information obtained from DEA data bases and based on an on-going DEA investigation, agents of the DEA have confirmed cellular telephone sites for HEARN'S cellular phone (313) 478-4974 is currently utilized by ZACHARY HEARN JR. And was being utilized on March 17, 2005. Additionally, agents and officers have analyzed cellular telephone sites for HEARN'S cellular phone . . . which determines the location the cellular telephone is operating. Based on the cellular telephone sites or locations, officers have determined on March 17, 2005, between 5:21 PM nad [*sic*] 5:40PM, the approximate time of the MURAD shooting, HEARN'S cellular telephone was hitting a cell tower located within five (5) miles of Metro Car Company, the location where COMPL MURAD was killed. Immediately following the shooting, HEARN'S cellular telephone travels out of the area to the other side of the city.

Additionally, agents have determined that in the days after the MURAD Homicide, HEARN'S cellular telephone is in contact with both DPD-1 and DPD-2's cellular telephones, which corroborates the fact DPD-1 and DPD-2 are associates of HEARN and furthermore, are in a position to obtain information, such as the location of the murder weapon.

On March 28, 2005, DPD-2 made telephone contact with ZACHARY HEARN at . . . (313) 478-4974. During the conversation, DPD-2 told HEARN he/she was interested in purchasing the firearm. HEARN directed DPD-2 to come to the described residence the following morning to see the weapon.

> On March 29, 2005, DPD-2, and Hearn have agreed to meet at the described target residence of 14270 Strathmoor . . . and negotiate the purchase of the firearm utilized in the MURAD homicide. DPD-2 has informed HEARN that he wants to inspect the firearm prior to it's purchase. Based on the above facts, the affiant believes that there is probable cause to believe that above mentioned will be found on/in the target address 14270 Strathmoor, Detroit . . .

> Affiant respectfully requests the court order this affidavit is not made public until needed in the prosecution of a criminal case. The affiant has reasons to believe that DPD-1 and DPD-2 and their family members would be in danger of retaliation by the release of this affidavit because their identities are know [*sic*] by HEARN.

The Search Warrant Tabulation and Return listed that the police recovered three weapons, including a .357 revolver, as well as two cell phones, miscellaneous papers, and clothing from 14270 Strathmoor.

**B.**

Johnson's first counsel[3] moved to suppress the seized items, arguing that the warrant affidavit lacked sufficient allegations from which the magistrate could conclude that the unnamed informants were credible or provided reliable information, and that the warrant failed to designate with particularity the unit to be searched at 14270 Strathmoor, a multiple-occupancy structure.

At the time the first suppression hearing began in October 2005, DPD Sergeant Lovier, the affiant, was no longer employed by the DPD. Six persons testified at the suppression hearing. Agent Donovan testified that after DPD-1 and -2 identified Murad's shooter as "Little Herm" or "Little Hearn," they provided Little Herm's cell number. Donovan testified that he ran the number through the DEA database and learned it was used by a man known as Little Herm. Donovan testified that

---

[3]Johnson's first counsel represented him until late June 2006, when the district court granted his motion to withdraw.

8

he met with case agents working on a separate drug and money-laundering investigation, the Michael Clark investigation, who told Donovan that they had intercepted Little Herm through wiretaps used in the Clark investigation, and believed Little Herm's name was Zachary Hearn. The agents investigating Clark told Donovan that Zachary Hearn was a member of Clark's organization. After Donovan spoke to the agents on the Clark case, he did further investigation and learned that the taxpayer for 14270 Strathmoor was Donnell Wilson, who was also a member of Clark's organization. Wilson had also been intercepted on the Clark-investigation wiretap, speaking to Michael Clark. The agents on the Clark case also informed Agent Donovan that there were two Zachary Hearns in the Clark organization—a Junior, and a Senior.

The district court denied the motion to suppress.

## C.

After the three-count superseding indictment issued, Johnson, through new counsel, moved to suppress the evidence seized and for a *Franks* hearing. Johnson argued that probable cause was lacking because the warrant affidavit established neither the informants' reliability or that the police had independently corroborated the informants' information. Johnson's counsel also argued that his affidavit made a substantial preliminary showing that warrant-affiant DPD Sgt. Lovier made deliberately or recklessly misleading statements in the affidavit, including that the informants knew, and had been in phone contact with, Zachary Hearn or Zachary Hearn, Jr.

By the time of the 2009 hearing, affiant DPD Sgt. Lovier had died. DEA Special Agent Donovan, who participated in drafting the warrant, testified again at the 2009 hearing. It is clear from the 2009 hearing transcript that the district court recalled well or had reviewed the testimony

from the 2005 hearing. The concluding remarks of counsel and the district court make clear that much of the 2005 hearing was devoted to exploring one of the issues Johnson later raised in his 2009 renewed motion to suppress and for a *Franks* hearing: whether and to what extent the police corroborated the informants' information.

The Government argued at the 2009 hearing that suppression of the evidence was unwarranted because the mis-naming of the alleged shooter in the warrant affidavit made no difference to the probable cause analysis. The Government also argued that Johnson was not entitled to a *Franks* hearing given Agent Donovan's lengthy testimony at the 2005 suppression hearing regarding how he and other agents honestly and mistakenly came to believe that "Zachary Hearn, Jr.," was the occupant of 14270 Strathmoor.

Following the 2009 hearing on Johnson's renewed motion to suppress, the district court concluded that Johnson failed to make a substantial preliminary showing that affiant Sgt. Lovier included false statements in the affidavit knowingly and intentionally, or with reckless disregard for the truth.

## III.

Johnson argues on appeal that the search-warrant affidavit failed to establish probable cause to support the issuance of a warrant. The Government conceded below that neither DPD-1 or -2 had a prior relationship with the case agents or warrant affiant, and that the warrant affidavit wrongly stated that DPD-1 and -2 named "Zachary Hearn, Jr.," as the person who shot Murad.

## A.

> It is well established that a magistrate may rely on hearsay contained in the affidavit when determining whether to issue a search warrant. [*United States v.*] *Gunter*, 551 F.3d [472, 479 (6th Cir. 2009)]. However, when the majority of the information in the affidavit comes from confidential sources . . . courts "must consider the veracity, reliability, and the basis of knowledge for that informants as part of the totality of circumstances." *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003). "While independent corroboration of a confidential informant's story is not a sine qua non to a finding of probable cause, in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration." [*United States v.*] *Frazier*, 423 F.3d [526,] 532 [(6th Cir. 2005)] (internal citations omitted).

*United States v. Dyer*, 580 F.3d 386, 390–91 (6th Cir. 2009); *see also United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000) ("information received from an informant whose reliability is not established may be sufficient to create probable cause when there is some independent corroboration by the police of the informant's information.")

We conclude that the affidavit contained sufficient police corroboration of the information DPD-1 and -2 provided to support a finding of probable cause. The affidavit stated that after both DPD-1 and -2 told police that the alleged shooter's cell phone number was (313) 478-4974 and that he lived at 14270 Strathmoor, cell-phone records the police obtained for that number showed that the phone registered on a cell tower located within five miles of Metro Car on the date and time of Murad's shooting, and that immediately after the time of the shooting the phone left the area. The affidavit also stated that the alleged shooter's cell phone had been in contact with both DPD-1 and -2 in the days after the shooting, corroborating that the informants were associates of or in contact with the alleged shooter and in a position to obtain information regarding Murad's shooting. The

affidavit thus contained sufficient independent police corroboration of the information provided by

DPD-1 and -2.[4]

**B.**

Johnson asserts that the fact that the informants came forward only in response to the reward

Murad's family offered casts doubt on their veracity, credibility and reliability. He contends that this

is particularly true given that the initial contact with the woman, who turned out to be DPD-1's

girlfriend, involved an apparent scam because she asked to be paid half the reward money before

providing information related to Murad's shooting. Johnson argues that had the warrant affidavit

set forth this information, it would have undercut any finding of the informants' veracity, credibility

and reliability.

We disagree. Although the warrant affidavit does not mention the female confidential

informant, or that the reward money motivated her and DPD-1 and -2 to come forward, those

omissions are not relevant to the determination whether the police independently corroborated the

information DPD-1 and -2 provided.

**C.**

Johnson also asserts that the warrant affidavit wrongly implied 1) that DPD-1 and -2

independently named "Zachary Hearn, Jr.," and 2) that they independently provided almost identical

information to the police. Johnson argues that since DPD-1 and -2 were associates, each informant

---

[4]Although not specifically mentioned in the affidavit, one of the eyewitnesses to Murad's shooting described the shooter to Agent Donovan as about 5'4" or 5'5" tall, thin build, and as having some kind of lip disfiguration, a description matching the one DPD-2 had provided the police.

provided "shared," not independent, information.  Johnson claims that "[w]ithout information sufficient to establish the [warrant affidavit's] implication that there were independent sources of information, the representations in the affidavit do little to provide corroboration."  This argument lacks merit because the fact that the anonymous informants did not provide corroboration for each other is not relevant to whether the police independently corroborated the information they provided.

**D.**

Johnson also argues that because the warrant affidavit did not state that either informant actually saw the weapon in the residence, DPD-1 and -2 did not provide a nexus between the weapon and 14270 Strathmoor.  Again, we disagree.  The affidavit states that DPD-1 told police that, during conversations with the alleged shooter regarding his involvement in Murad's shooting, the alleged shooter told DPD-1 that the firearm used to shoot Murad was in his possession.  The affidavit also stated that during a March 28, 2005, conversation DPD-2 had with the alleged shooter at (313) 478-4974, DPD-2 told the alleged shooter that he was interested in purchasing the gun, and the alleged shooter directed DPD-2 to come to 14270 Strathmoor the following morning to see the weapon.

Under the totality of the circumstances, the issuing judge had a substantial basis for concluding that the warrant affidavit showed a fair probability that evidence of Murad's shooting would be found at 14270 Strathmoor.  *Illinois v. Gates*, 462 U.S. 213, 236 (1983)*; United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).  Johnson's motion to suppress was properly denied.[5]

---

[5]Given our disposition that the warrant was supported by probable cause, we need not address Johnson's challenge to the district court's alternative holding that the good-faith exception of *United*

**IV**.

Lastly, Johnson challenges the district court's determination that the warrant affidavit's references to "Zachary Hearn, Jr.," did not warrant a *Franks* hearing.

**A.**

We review the district court's factual findings for clear error and legal conclusions de novo. *Graham*, 275 F.3d 490 at 505. "Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a [*Franks*] hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978); *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008) (to obtain a *Franks* hearing, the movant must both make the substantial preliminary showing described in *Franks*, *and* show that the allegedly false statements were necessary for the magistrate's determination of probable cause.) "What remains of the affidavit establishes probable cause if it 'provide[s] the magistrate judge with a basis for finding there was a fair probability that contraband or evidence of a crime would be found' at the stated location." *Mastromatteo*, 538 F.3d at 545 (alteration in original) (quoting *Graham*, 275 F.3d at 504).

The determination whether a statement in an affidavit is made with reckless disregard of the

*States v. Leon*, 468 U.S. 897 (1984), applied.

truth is a fact question. *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007); *see also United States v. Bennett*, 905 F.2d 931, 934 (6th Cir.1990) (reviewing this determination for clear error).

**B.**

The district court did not clearly err in finding that the affidavit's references to the alleged shooter as "Zachary Hearn, Jr.," (as opposed to "Little Herm" or "Little Hearn") were neither intentional or made with reckless disregard of the truth. *Rice*, 478 F.3d at 709. As discussed above and as the district court observed, Agent Donovan explained at the 2005 suppression hearing how the name Zachary Hearn, Jr., came to be used in the warrant affidavit. The mistaken name does not rise to the level of a false statement, nor is it material to a finding of probable cause. Accordingly, the district court properly denied Johnson's request for a *Franks* hearing.

**V.**

For these reasons, we **AFFIRM** the district court's denial of Johnson's renewed motion to suppress and motion for a *Franks* hearing.